Mr. Abney. Good morning, Your Honors, and may it please the Court, George Abney, appearing on behalf of the Miccosukee Tribe of Indians of Florida. The fundamental error in this case occurred at the summary judgment level. And on summary judgment, the District Court made an error in interpreting the Indian Gaming Regulatory Act and the tax provisions of the Indian Gaming Regulatory Act. Specifically, the tax provisions of the Indian Gaming Regulatory Act provide that net revenues from gaming are subject to taxation, and there's a corresponding provision in the Internal Revenue Code that also discusses taxation of gaming distributions, and it uses that term again, net revenues derived from gaming. It's very specific in IGRA, and it's very specific in the Internal Revenue Code, so it's not a coincidence that Congress chose the term net revenues. Well, let me ask you a question, and then you can try to answer it during the remainder of your argument. Tax law generally rejects formalism and looks to the economic reality of transactions, right? That's correct. By and large. And the term net revenues makes sense, it seems to me. If you have a third-party operator who's running your gaming, so in other words, if the Miccosukee tribe was in contract with a gaming company, and the gaming company ran its bingo or casino, and they had to pay them a certain amount, then of course, whatever the gaming operation derived, you take off the top, whatever you had to pay the operator run, and whatever's left by and large is net. But when the tribe is both the owner and operator of the facility, why is the gross receipts tax something you take off the top to get to net revenue? Because if it is, what prevents the tribe from raising the gross receipts tax to 50 percent, or 60 percent, or 70 percent, so that there's almost no net revenue really left, and you're skimming everything off the top, and then you're distributing all of that per capita to tribal members. Well, Your Honor, I think your question is a fair one, and I want to put that in context. What the tribe did, long before gaming was ever contemplated by the Miccosukee or other tribes, in 1984, as early as 1984, the tribe enacted an ordinance, and it's in the record in this case, and that ordinance imposed a gross receipts tax on all tribal enterprises. It didn't matter if it was being operated by a third party outside the tribe. It didn't matter if it was an enterprise being operated by the tribe itself. But that goes back to 1984, when the first gross receipts tax was enacted by the tribe. And so when you do the formalism analysis, the mere formalism analysis that the government has put in its brief, you have to look at those facts, and you have to look at why this particular form was chosen. And if this form was chosen for valid reasons, and not strictly for tax reasons, and there's no indication that it was done to avoid or evade any sort of tax obligation, then I think the courts traditionally will respect the form that the taxpayer has chosen. And in this case, going back to 1984, the tribe enacted a gross receipts tax. And then you fast forward to 1989, the tribe engaged with a third party contractor to build the gaming facility. And they specifically, in that contract, waived the application of the gross receipts tax for a brief period of time so that that contractor could recoup its investment when it built the gaming facility. So it could not be the case that the tribe enacted this gross receipts tax simply to evade tax on gaming revenue. They clearly had this gross receipts tax in place well before and long before gaming ever took place, and they contemplated it being applied to gaming all along. So I think that answers your question, Your Honor. So the district court made a fundamental error in not paying heed to the specific language of the statute. The statute says net revenue from gaming is subject to tax, and the Internal Revenue Code says net revenue from gaming is subject to tax. But what the district court did on summary judgment is she held that any distribution derived from gaming revenue is clearly taxable income. And that impacted the case on a going-forward basis and colored this case at the summary judgment stage going forward. And the district court did not make any specific findings of fact regarding the tribe's gross receipts tax, whether it was entered into for a valid purpose, whether it was entered into for a tax-avoidance purpose. The district court made no findings of fact on that specific issue, and that's a very important issue, because if it's net revenue from gaming, it gets treated very differently under the Internal Revenue Code than if it's something else. And there's no dispute that the tribe, as a sovereign entity, clearly has the authority to impose taxes and levy taxes on businesses that it operates, on individuals who come into those businesses, or third parties that operate businesses on tribal land. This is a legitimate, bona fide tax, and the revenue from that tax was distributed to tribal members. And it's not subject to the tax provisions of IGRA. The tax provisions of IGRA and the Internal Revenue Code are very clear, and they apply only to net revenue from gaming. So then, once, if the district court were to make a determination, or were to look at the facts regarding the tax, the tribe's gross receipts tax, the evidence is very clear that that tax was in place long before gaming ever began. And at trial, Dexter Leighton, who was the tribe's attorney at the time, testified that it was never designed as a scheme to evade or avoid taxes, and that the way the tribe was collecting tax revenue and distributing it to its members was fully disclosed to the Bureau of Indian Affairs, to the National Indian Gaming Commission, and to the Internal Revenue Service. So this was not an effort to evade a tax obligation. So then we get into the question of, if it's not net revenue from gaming, and if it's not subject to IGRA or the Internal Revenue Code provisions, then you have to do an analysis of whether the General Welfare Exclusion Act applies. And we've laid that out in our briefs, but the only two points that appear to be in dispute are whether or not this distribution was for the promotion of general welfare, and whether or not it was lavish or extravagant. Can I ask you one question on that? Yes, Your Honor. I know the act was seen by some in Congress as a codification of earlier IRS practice, but why does it make sense to apply a 2014 piece of legislation to a 2001 tax liability? Well, because, Your Honor, I believe the provisions of the act, of the GWE Act, call upon the suspension of audits while Congress, I'm sorry, while the IRS and the Tribal Advisory Committee are trying to put together guidelines for what constitutes lavish and extravagant. And that still hasn't happened, right? That still has not happened, Your Honor. So in 2014, when they passed the GWE, they specifically contemplated that it would apply to ongoing audits that involve GWE, and Ms. Jim's situation in the trial below is sort of the functional equivalent of the audit. She had the opportunity to challenge the IRS's tax liability, so I believe it does apply to Ms. Jim's liability. But what the government wants to do is to... Mr. Abney, your time is running. Okay. All right. Well, I'll just conclude with, Your Honor, we believe that this does qualify as general welfare under the General Welfare Exclusion Act, and that these benefits are not lavish and extravagant, or if there's a portion of it that could be determined to be lavish or extravagant, any amount below that amount should be subject to the General Welfare Exclusion Act. Thank you, Your Honors. Mr. Sanuki. I would correct and say Mr. Sanuki, Your Honor. Everyone puts the E on the end, but nonetheless, as my professor said, we'll begin. Sally Jim is an enrolled member of the Miccosukee Tribe, and I gave her certain rights that fall under the purview and scope of the Bureau of Indian Affairs, not the Internal Revenue Service. Mr. Abney is correct, and we adopt the arguments he's already made on behalf of Ms. Jim. He's correct that the lower court stopped the ability, or failed, or abused its discretion in analyzing federal statutes and laws, treaties, and obligations the U.S. had with the tribe and its members with regard to this method that they calculate the use of their lands. The gross receipts tax- But all of the things that you're referring to in your brief, it seems to me, deal with the relationship of the federal government to the tribe, and whether or not the federal government can exercise taxing authority as to the tribe, and I think on those points, you're probably right. But it's been at least federal common law since the 1940s or 50s that members of Indian tribes are generally subject to income tax in the same way as everybody else is, unless there's an exception or some carve-out. So isn't Ms. Jim stuck with that? You're 100% correct, Your Honor. Indians pay taxes like everyone else in the United States, as Squire v. Kaplan said, unless there was a specific treaty or statute that exempts them from that. And what Ms. Jim relies upon are treaties and statutes between the United States and the tribe that exempt the income earned from its lands as taxable included income under Section 61 of the Internal Revenue Code, specifically the Miccosukee Reserve Area Act and the Settlement Act of 1982, which included a statutory construct, 25 U.S.C. 1750, that exempted all of the Miccosukee's lands from federal and state income tax. It says that clearly in the law. So she's relying on that as a starting point for why these funds, as paid at the 8.7% of gross revenue for the use of the land that the gaming facility sits on, are exempt from taxation. It's directly in line with the Supreme Court's holding. And if there's an ambiguity in the application of that, it has to be liberally construed in favor of the tribe. So the government, but under your theory, the government, and you may be right, the government cannot tax any member of an Indian tribe on gaming revenue. No, absolutely not. As Mr. Ravni said, and as the statute says, net gaming revenue. No, no, but if you're right about the effect of those other statutes and treaties, the other stuff doesn't matter. Because if you can't tax revenue derived from land given to the Miccosukee tribe, you can't tax it at all. And that treaty supersedes any later statutes that Congress passed. So if you're right, it doesn't matter what net revenue is. If the income is derived from Indian lands, in this case, the bingo operation is on Miccosukee land, you can't tax it at all. So net revenue doesn't matter, lavish and extravagant doesn't matter, none of that matters. Well, I wish it was that simple. I think you have to look at what derived from land means, and that's what the court did attempt to do. But the lower court stopped its analysis because it didn't go into the statutes that control and dictate how Indian lands may be used and what that term means. There's no question that leases or payments for tribal lands is tax-exempt to the people who hold that land. That's well-settled internal revenue and commissioner law and revenue rulings. What the lower court didn't do was look at the Bureau of Interest Statutes, which has a sole authority over all matters arising out of Indian country, that allows the tribe, with its inherent sovereign authority, to determine the method of computing the value of their land, how it's used, and how they'll be compensated for that use. That's what the gross receipts tax is. In 84, when they enacted it, given the unique nature of the Everglades, it was hard to get a comp for different areas. Is it your argument at bottom line that the tribe, by its own sovereign regulations, etc., can decide how much tax is paid to the United States? No. The tribe, by its own sovereign authority, can determine the method by which it leases and uses land. I understand that by doing all of that, they can lock the United States out of any taxes. Is that your argument? No. All right. To what extent is the tribe curbed? Well, they're a dependent nation. Congress can pass legislation which impacts them negatively or positively, clearly. But in this instance, Congress gave that authority to the Bureau of Indian Affairs. And the undisputed and unrefuted testimony of trial was that the BIA approved the method by which the tribe was conducting the use of its land with this gross receipts fee. And the settlement agreements that were entered into were completed during a time that the tribe was already imposing this 8.7%. So you can impute to Congress and everyone else that was involved in that negotiation that they accepted and approved of that methodology for receiving money. I do not disagree, and it's not Mr. Jim's position, that a net revenue distribution of Indian gaming, even with the Miccosukees, would be taxable. That is not our argument. Our position is that the tribe, within its sovereign authority and the reservation of rights it retained through its treaties, has not only the authority, but it's mandated that they can and should determine the best use of its land and how to compensate for that. The simple fact that the lower court of the IRS says it's from gaming, that means it's taxable, does not even get to the root of where the money comes from. And the tribe has said, and the Bureau of Indian Affairs agrees, the best person in the best position to determine how to use its lands is the tribe, and that's what they've done at this point. You'll save some rebuttal time. Mr. Brannum. Please the Court. Robert Brannum for the United States. Judge Jordan, I think you've got your finger on the key issue, the key understanding of the primary issue. Can you keep your voice up a little bit? There you are. Okay. I'll lean forward a little bit to this microphone. Judge Jordan, I think you've got your finger on my understanding of the key issue as well, but I'd like to fill in a few points. In my... Well, first of all, one thing I left out of my brief that I should have included is the Indian Gaming Regulatory Act has a definition for net revenue. It's a defined term, and it's used in several places throughout the Act. The definition is net revenue from Indian gaming is gross revenue from Indian gaming minus prize payouts and operating expenses. That's it. What's the definitional provision in the IGRA? It is... I'm sorry. I should have that right away, but I think it is a 27, I think it's 2711. The district court didn't cite to that definition in its order. It did not, and I apologize for not citing it in my brief right up at the front, but it is a defined term. It's gross revenue from Indian gaming minus prize payouts and operating expenses. Was that definition in place in 2001? Oh, yes. Because the Act has been amended in pieces over time, right? Yeah, the definition has been in place all along. The definition is used in several provisions. How tribes may use net revenues is limited to certain enumerated purposes. One provision is management fees may not exceed 40% of net revenues, so that most of the benefit of the casino goes to the tribe and not to managers. But returning back to this gross receipts tax, the question to ask is, is it a prize payout or is it an operating expense? And it is neither. An operating expense, I shouldn't have to say, is something that the operator has to pay to a third party, not something the operator keeps for itself. Gross receipts tax is a tax that the tribe imposes on its operations and keeps for itself and puts in another account. It's not an operating expense. I'm not even sure it's a tax. My understanding of tax requires two entities, a taxpayer and a tax collector. And if the tribe is imposing a tax on its own activities and keeping them, I'm not sure it's really a tax. It's not in the record, but I'm assuming that before the casino, the tribe used the gross receipts tax as something like a sales tax. You want to buy gas at our tribal gas station, we're charging $3 plus a gallon plus 5%. You want to ride on the airboats, for four it's $100 plus 5%. There's no evidence that the gross receipts tax was imposed on wagers in the casino in that fashion. It looks like, from all the record shows, the tribe's accountants simply applied a formula to revenues from the casino and extracted a gross receipts tax. I thought it was, whatever one may think of the legal implications, I thought that it was undisputed that the gross receipts tax was based on monies coming in to the bingo operation, whether it was somebody buying food or somebody playing a game or somebody placing a wager or somebody paying for their car having been valeted. So whatever money came in, the gross receipts tax applied to all of the income that was being received. Is that incorrect? No, that's correct. And certainly some of those revenue sources might not be gaming revenue, sale of drinks, parking valet, whatever. And that's why the district court gave the tribe and Sally Jim an opportunity to show at trial what portion of the distributions came from other sources. And she held off analyzing whether those other sources were exempt from tax until some source had been shown. And by the end of the trial, she concluded that no evidence had been introduced as to what portion of the distributions came from a source other than gaming. I'm going to help out my opponent and give a better answer to the question, what sense does it make to apply the 2014 law to a 2001 liability? When the law was passed, it was made effective for all open years. Ms. Jim had not filed a tax return in 2002 and had, in fact, never filed one until after the complaint was filed. So it was still an open year and technically the Welfare Exclusion Act can't apply to 2001. Was that part of the codification or just the drafting part that you can find in the statutes at large? It's not in Internal Revenue Code Section 139E, but it's in the statute. The provision making it effective for all open years. That provision is codified? No. It's in the statute, but it's not in the code. It's in the statutes at large? Yes. But not in the code? Correct. So where do I find it? Statutes at large. Right. Which is for this act, maybe if you can locate it at some point, maybe let us know afterwards, that'll be fine. Okay. I've got it cited in my brief. I spent a minute on Mr. Sanook's theories about ambiguity and income from the land and so forth. I read through his brief over and over again, looking for specific statutory language from a specifically cited statute supporting the theory that gaining revenue is open to interpretation by the chairman of the tribe or is ambiguous in some fashion, and I could not find actual language. That's all I have to say about that theory. Can I turn you to a couple of areas where I do have some concern, please? The check that was made out, or I know there were a number of checks, but I'm going to because they were all, according to the district court's order, the same. So the check written by the tribe to Ms. Jim and her family was made out to Ms. Jim and to her husband. Not or, but and to her husband, right? The ones that we have are, I think they're Exhibit 39. There are several checks. Most are made out to Ms. Jim and her husband. Some are made out to just her. Okay. Let's talk only about the ones that are made out payable to her and her husband. Yes. Under all the law that I'm aware of, including the Uniform Commercial Code, a check that is payable to two people jointly with an and instead of an or belongs to both of those people and in fact requires the endorsement of both of those people to negotiate. And there's also testimony in the record, undisputed I think, that Ms. Jim gave her husband the quarter share that purportedly belonged to him when she negotiated the checks. If that's the case, why isn't the economic reality that $68,000 for tax year 2001 is attributable to Mr. Osceola and not to Ms. Jim? Okay. I've got two answers. One is that Ms. Jim testified that she endorsed her husband's name on the checks. I know. So she may have committed some transaction that was not quite valid, but the economic reality is that everything happened as if both of them had negotiated the check. She kept her share and the share for the two children and she gave him the one quarter share that the tribe deemed he was entitled to. Understand your point. So if they had gone together to a bank or to the tribal administration office, presented their IDs, gotten $272,000 in cash, I know it happened over a number of events, but using one example to simplify. And the teller says, how would you like this money? And she says, I will take $204,000 and Mr. Osceola says, I will take $68,000. And the teller gives them those amounts respectively. If they filed tax returns in 2001, who gets taxed on the $68,000 that went to Mr. Osceola? Perhaps could be him. It would be him. Would it not? It would be him on those facts, yes. What has changed to make her liable for that $68,000 given that the tribe intended it for him and although she negotiated the check maybe improperly, he got the money, the entire one quarter share and used it. I take the point. It's a good point. In my research, I couldn't find any cases close enough to this to provide any sort of this issue after a trial in which Ms. Jim testified, her husband testified, their adult daughter testified, and several tribal officials testified. She based her decision. It's a fact-bound issue. No, it's not. It may not or it may not be because what constitutes taxable income to one person? If he had filed a tax return in 2015 saying, I got $68,000, I now understand that it's taxable income to me, I'm ready to pay my taxes, and I'd like you to talk to me about a payment schedule for penalties, the IRS would have said, thank you very much and sent a letter to him and said, we're ready to talk. The IRS would have processed the return, yes. And would have taken his money gladly. The IRS isn't glad about things. You know, that is probably a very true statement. That's probably a very true statement. It would have processed the return and taken the money and perhaps he would have sued the next year and said, I want it back, it really wasn't mine. The government is always talking about economic reality. You start with the economic reality of the situation and that is a fact-bound issue. One that Judge Altanaga made after considering other facts. But she almost ignored the fact that he took the money and the money was his and she gave him the money. She never exercised any use of that money. In this case, she won't. And the check was made out to the two of them. In this case, she walked away from the Tribal Administrative Office with the cash and she gave some to him. No, she gave it all, she gave him the one quarter share according to her testimony and that's undisputed. And then he used it for whatever purposes. Yes, yes. That was her testimony. Her credibility is at issue. I'm sorry? I would say her credibility is at issue, so I don't know that anything is undisputed. Did she ever file a tax return for 2001? She filed a tax return after the complaint was filed. Was it a joint return or a single return? She filed single. She checked a box. What about her husband? Did he file a return? He testified that he never reported the income, the payments to anyone. But did he file a return is the question I have. It's not in the record. We don't know. We don't know. Did she file a return? She filed a return after the complaint was filed. No, she filed it after the fact. She reported the entirety of the money as excluded welfare benefits. All of it, the whole 272? The 272,000, yes. That alone raises a credibility issue about her testimony. Judge Eltsonga found her not credible in testimony about why she didn't file it. She filed a return and says, I got $272,000 as welfare benefits. I did. And then she testifies that she gave some of the money to her husband. Yes. Because some of the... All I'm saying is that if you really want to split hairs, there are a lot of... It's a richer and more complicated situation than Judge Jordan's hypothetical. I think it's a vexing question, but I think the best answer is it's fact-bound and it's true. Judge Eltsonga's decision was not clearly erroneous. Why did the judge handle this as a bench trial? Why did she handle it as a bench trial? Because you had... It would have been easy rather than summary judgment. There was... The point I'm making is that the clearly erroneous rule applies to findings of fact on a bench trial and summary judgment, there's no such... We have a different standard. Right. As Judge Jordan noted, there was testimony... That's what their argument is. I say that their argument is the summary judgment should not have been granted because they're fact-related. There was no summary judgment on this issue, the attribution of his quarter. There was only summary judgment on the conflict or the resolution of the Welfare Exclusion Act and the Indian Gaming Regulatory Act and the stature of the gross receipts tax. How do you figure out what's lavish and extravagant? That's going to be a difficult problem for the Congress to get to the Secretary after a consultation with the Tribal Advisory Council. Yeah, but the problem is ours now with no help. I don't think you need to reach it in this case. The Indian Gaming Regulatory Act is absolutely unambiguous about how to treat per capita distributions of net revenue from gaming. But the district court reached it. She didn't need to. I understand. It was a subsidiary ruling. I understand. So I'm asking you, if we proceed down the same analytical road as a district court and we have to address that issue, how do you begin to figure out what constitutes lavish and extravagant? I think in terms of distributing welfare benefits, lavish and extravagant is going to be a problem. Distributing casino revenue, anything is lavish and extravagant. Distribution, what is a reasonable amount? Your point is that you don't even get to the lavish and extravagant because that only applies to general welfare benefits and distribution of gaming revenue is not a general welfare benefit. Correct. That is my understanding. That's my position. Okay. I'm short on time. I didn't hear anything in opening argument about the penalty issue or the judgment issue. So I've not devoted any time to that. I think we have your argument. Okay. Thank you. I want to quickly address some points that were raised by Mr. Bromman. Number one, the judge at no time used the term net gaming revenue in either her summary judgment order or the final order. It was simply a declaration that gaming revenue was taxed. And you can look at both of those orders in the record. So she never analyzed what does net mean. Did anybody tell her what net meant? Most certainly. What did you believe net revenue meant? Well, net revenue under GAAP principles includes, as my esteemed opposing counsel says, payments to a third party. The third party receiving this money are the individual members, and they're receiving it as compensation for the use of the land that they hold in undivided interest. To say that that is not an operating expense is a ridiculous application of what's generally accepted in the accounting world. That argument was presented to the district court? Yes, Your Honor, both in brief and in testimony. That it was essentially a pass-through cost? A pass-through lease provision. What was undisputed and what's interesting about this case is that the United States put on no evidence. They rested solely on the testimony and trying to contradict testimony of the tribe and Mrs. Jim's witnesses. They didn't put up a single person. So what's undisputed is that the BIA's representative is the chairman of the Miccosukee tribe. And that representative, on behalf of the BIA, approved this method. So that's undisputed in any context and was presented to the court. So the word net is never used any place in her orders. And she just simply glosses over that and says all gaming revenue is a tax cut. There's an implied finding, as far as the bench trial is concerned, there's an implied finding that it came from gaming. I think her ruling is an indication that the monies come from, obviously, the gaming facility. It's the largest income producer. Gaming profits were distributed. It's gross revenue. I understand. And the other part of the misstatement is that he believed that this was a sales tax on other entities. If you read Exhibit 75, the 84 ordinance, the tribe clearly delineates out sales tax and other taxes and the method by which they're supposed to be computed. And those are separate and apart from the gross receipts tax. That was a creation by the tribe to try and address the unique nature of all members owning an undivided interest in lands and their constitution, which says all resources are shared equally by all the members. It was not practical to have 600 members sign a lease agreement or to get guardians and trustees for minor children to sign a lease agreement for every piece of dirt that was utilized by any entity, even the tribe. And the tribe, although it's comprised of its members, must still ask permission of everyone to have a gaming facility to put a business there. That's what they did. General welfare, I want to address that just briefly. Very briefly because you're time is up. General welfare includes the tribe continuing to exist. The purpose behind the Indian Self-Determination Act and AGRA was to create economic development so that tribes could continue to grow. They now call it nation building. We understand your point. So we would suggest that the court reverse the lower court's ruling and remand at the very least but at the most overturning decision. Thank you very much. We'll move to the third case if you all want to take a break.